**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| KENNETH MALIK MILLER | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| DAVID DIGUGLIELMO, et al. | : | NO. 07-2686 |

<u>**MEMORANDUM**</u>

**Baylson, J.**                                                                               **November 30 , 2010**

**I. Introduction**

Plaintiff, Kenneth Malik Miller is a Pennsylvania state prisoner currently serving a life sentence for first degree murder and has during all times relevant to this action been incarcerated within Pennsylvania prisons, including the State Correctional Institutes at Graterford and Huntingdon ("SCI Graterford" and "SCI Huntingdon"). Plaintiff filed this action for money damages pursuant to 42 U.S.C. § 1983, and the First, Fifth, and Eighth Amendments of the United States Constitution against the Superintendent, Deputy Superintendent, and other correctional officers at SCI Graterford. Plaintiff originally asserted four claims as follows:

Count I:       Retaliation for his making complaints and preparing to file litigation.

Count II:      Denial of due process relating to the confiscation/loss of his wedding ring.

Count III:     Denial of access to courts for legal redress.

Count IV:      An Eighth Amendment claim for not responding to his complaints about his cell being unreasonably cold.

Presently before the Court is Defendants' second Motion for Summary Judgment as to Counts I and II (Doc. No. 90). Counts III and IV were previously dismissed.

## A. Procedural History

Plaintiff filed his original pro se civil rights complaint on July 3, 2008 (Doc. No. 3). The Second Amended Complaint, filed after Plaintiff secured appointed counsel, named as Defendants David DiGuglielmo (Superintendent of SCI Graterford); Michael Lorenzo (Deputy Superintendent of SCI Graterford); Thomas Dohman (Security Captain at SCI Graterford); William Radle (Security Lieutenant at SCI Graterford); John Moyer (Security Lieutenant at SCI Graterford); Jason Dombrosky (Corrections Officer at SCI Graterford); and Ronald Quick (Corrections Officer at SCI Graterford) (Doc. No. 53).[1]

Defendants first moved for Summary Judgment on September 16, 2009 (Doc. No. 62). At oral argument, held on December 8, 2009, the Court ruled on all four Counts, memorializing the decision in a Memorandum (Doc. No. 75) and Order (Doc. No. 76) issued on December 15, 2009. See Miller v. DiGuglielmo, No. 07-2686, 2009 WL 4857383 (E.D. Pa. December 15, 2009). As Plaintiff agreed to withdraw all claims against DiGuglielmo and Lorenzo, the Court dismissed these Defendants with prejudice from the litigation. Id. at *1. The Court also granted summary judgment in favor of all Defendants as to Count Three, determining that a prior decision on Plaintiff's Post Conviction Relief Act ("PCRA") petition barred relief in this case. Id. Recognizing that Plaintiff had brought Count Four solely against DiGuglielmo, the Court also granted summary judgment to DiGuglielmo as to Count Four. Id. at *2.

The Court denied Defendants' Motion for Summary Judgment as to Counts One and Two. Id. The Court found issues remaining as to whether Defendants had possession of Plaintiff's wedding ring, precluding an immediate decision on these Counts. The Court ordered

---

[1]Each of the Defendants has been in their respective positions at all times relevant to the Second Amended Complaint. (July 23, 2009 Dohman Dep. at 10-11; Aug. 12, 2009 Moyer Dep. at 7-8; Aug. 5, 2009 Radle Dep. at 8-9; Aug. 5, 2009 Dombrosky Dep. at 7-9.) Neither party has included Defendant Quick's deposition in their exhibits, but his tenure at SCI Graterford is undisputed.

Defendants to provide Plaintiff an opportunity to examine the ring to determine if Defendants maintained possession and, if so, to resolve the question of whether the ring could remain with Plaintiff or be given to a family member.  Id. at *2.

On December 29, 2009, Plaintiff filed a Motion for Clarification or Reconsideration (Doc. No. 78), asserting that the Court incorrectly disposed of Count Four.  See Miller v. DiGuglielmo. No. 07-2686, 2010 WL 1539965, *1 (E.D. Pa. April 14, 2010).   Plaintiff requested the Court either clarify that it had determined Plaintiff to have put forth insufficient evidence to raise a material issue of fact as to the Eight Amendment claim or reinstate that claim against DiGuglielmo.  Id.  In a Memorandum (Doc. No. 85) and Order (Doc. No. 86) issued on April 15, 2010, the Court affirmed its prior ruling, finding Plaintiff to have provided insufficient evidence to support the claim.  Id. at *3.

Counsel for the remaining Defendants (Dohman, Radle, Moyer, Dombroski, and Quick, respectively) moved for Summary Judgment for the second time on June 15, 2010, submitting a statement of undisputed facts  (Doc. No. 90).  At oral argument held on August 10, 2010, the Court requested Plaintiff submit a supplemental memorandum of law and a supplemental statement of undisputed facts, which Plaintiff did on September 10, 2010 (Doc. Nos. 97 and 98).  Defendants responded to both documents on September 27, 2010 (Doc. Nos. 101 and 102).

For the reasons discussed below, the motions for summary judgment on Count Two by Radle and Dohman and on Count One by Dombrosky are denied .  All other motions for summary judgment are granted.

**B. Factual History**

This case concerns events surrounding the confiscation and loss of Plaintiff's wedding ring, as well as a series of grievances filed by Plaintiff against certain Defendants and misconduct charges filed by certain Defendants against Plaintiff.   Given substantial disputes of

fact, the Court will consider the facts in the light most favorable to the Plaintiff, as the non-moving party. The Court relies on facts not in dispute, but, where disputes exist in the record, relies on facts established by documents and/or deposition testimony as cited by Plaintiff. The factual discussion summarizes Plaintiff's contentions, but resolution of factual disputes is reserved for trial.

Plaintiff has been in Pennsylvania Department of Corrections ("DOC") custody since 1987 and was incarcerated at SCI Graterford from 2000 until September 25, 2007. (Aug. 13, 2009 Pl. Dep. at 9:8-22; Moyer Dep. at 43:4-5.)

During the events related to Plaintiff's claims, Defendant Thomas Dohman directly supervised Internal Security Department ("ISD") Lieutenants. (Dohman Dep. at 10-11.) In 2004, Dohman initiated an investigation of Plaintiff, based on information indicating that Plaintiff and his cousin, another SCI Graterford inmate, were distributing drugs and other contraband throughout the prison. (Dohman Dep. at 58-59; Defs.' Dep. Exh. P10.) Starting on February 20, 2004, Dohman and Moyer monitored Plaintiff's non-privileged in-coming and out-going mail. (Dohman Dep. at 58-59, 63-64; Defs.' Dep. Exh. P10.) Through mail surveillance, Defendants identified letters containing street or prison terms, which Defendants maintain signaled Plaintiff's involvement in illicit activities. (Moyer Dep. at 33-34, 67-68; Defs.' Dep. Exh. P11.) Defendants continued surveillance of Plaintiff's mail in order to identify prison staff involved in distribution of contraband. (Moyer Dep. at 40-41.)

### 1. Plaintiff's MRSA infection

In February 2006, Plaintiff contracted Methicillin-resistant Staphylococcus aureus ("MRSA"), a serious bacterial infection, requiring treatment in the Graterford infirmary. (Pl.

Dep. 29:1-23; Pl. Ex. B at P18.)[2]   Following treatment, Plaintiff began to work with other

inmates and civil attorneys to initiate a class action against Graterford officials alleging their

deliberate indifference to his need for MRSA-related care.  (Pl. Dep. 42:4-44:9; 149:21-152:15.)[3]

On March 7, 2006, Plaintiff filed Grievance No. 146183, complaining that Dombrosky

conducted a "rough pat down search" that aggravated Plaintiff's MRSA-related wounds. (Pl.

Dep. at 27:17-23, 28:1-31:19; Pl. Ex. D-2, pp. 1-2.)   On that same date, Plaintiff sent a hand-

written letter to DiGuglielmo describing the incident.  (Pl. Ex. C at P19.)  Plaintiff received a

response to the March 7, 2006 grievance from Captain Dennis Blumfield dated March 24, 2006,

which stated merely that officers are obliged to conduct pat down searches "in a way to uncover

any contraband[,]" but without "offend[ing]" the prisoner.  (Pl. Ex. C. at D2.)

### 2.    Raid on Plaintiff's Cell

On May 28, 2006,  Dombrosky and Quick were assigned to be a search team, tasked with

conducting six random searches per shift, in conjunction with requirements that each cell be

searched several times per year.  (Dombrosky Dep. at 26; Radle Dep. at 20:1-22:11.)   On that

---

[2] "MRSA can be spread through direct contact with infected individuals or through contact with materials that have been exposed to the bacteria. Conditions frequently associated with corrections facilities – including overcrowding, shared facilities, and close contact between inmates – can increase the risk of spreading."  Kaucher v. County of Bucks,  455 F.3d 418, 421 (3d Cir. 2006).

[3] MRSA litigation has been filed  in this Court against the DOC and county prisons, see e.g., Wheeler v. Prison Health Services, Inc.,  No. 09-410, 2010 WL 3489405, at *1 (E.D. Pa. Sept. 1, 2010) (Shapiro, J.),  Malles v. Lehigh County, 639 F. Supp. 2d 566 (E.D. Pa. 2009) (Dalzell, J.), Keller v. County of Bucks, No. 03-4017, 2005 WL 675831, at *1 (E.D. Pa. March 22, 2005) (Fullam, J.), but Plaintiff indicated in his deposition that he never filed such litigation. (Pl. Dep. at 149:21-150:14.)

date, the two Defendants searched Plaintiff's cell, confiscating three photographs, which depicted Plaintiff with prison employees, and a ring embedded with stones. (Pl. Dep. at 47:8-9, 47:19-20; 52:5-7; Dombrosky Dep. at 28:1-29:24.) Throughout Plaintiff's time in custody, DOC regulations have barred inmates from possessing rings with embedded stones or photographs of staff members to whom they are not related. (Pl. Dep. at 47:5-7; Dohman Dep. at 43:17-44:10; Dombrosky Dep. at 28:1-29:24; Radle Dep. at 24:1-26:24.) At the outset of the search, Plaintiff denied to Dombrosky that he possessed any contraband and later claimed that he had rightfully possessed all confiscated items. (Dombrosky Dep. at 28:1-6; Pl. Dep. at 46:23-47:19.) During the search, Plaintiff witnessed Dombrosky reading Plaintiff's legal materials, including the March 7, 2006 grievance and materials related to Plaintiff's development of a MRSA lawsuit.[4] (Pl. Dep. at 28:12-25, 29-32, 33:1-14, 35-37, 41:8-42:23; Pl. Ex. C at D4.)

On the same day as the search, Dombrosky issued a misconduct to Plaintiff for possessing contraband, including the ring with stones and the photographs, and for lying to an employee. (Pl. Dep. at 48:25-49:8; Dombrosky Dep. at 24:12-25:13; Pl. Ex. B at P19.) At the conclusion of the search, Dombrosky issued to Plaintiff a Confiscated Items Receipt, listing each of the items taken. (Dombrosky Dep. at 35-36, Defs. Ex. 6 at P1.) Dombrosky turned the ring and the photographs over to Dohman and did not see them again. (Dombrosky Dep. at 44:11-45:5.) Dombrosky also charged Plaintiff with possession of scented oil, another contraband item. (Pl. Dep. at 48:25-49:8; Dombrosky Dep. at 24:12-25:13, Pl. Ex. B at P19.) Plaintiff denies that he possessed a bottle of oil during the search or that any was removed from his cell. (Pl. Dep. at

---

[4]Defendants admit only that Dombrosky searched Plaintiff's papers as part of the cell search, but deny Dombrosky read any of Plaintiff's legal materials. Defendants concede that Plaintiff's version of these events "controls" for the purpose of summary judgment. (Defs.' Reply to Pl.'s Supp. Counterst. of Facts ¶ 96.)

53:6-25; 55:7-19; 56:18-24.)  Security was never able to produce the oil allegedly confiscated from Plaintiff.  (Radle Dep. at 35:6-36:2; Pl. Dep. at 63; Pl. Ex. B at P20.)

On May 31, 2006, Hearing Examiner Mary Canino convened a hearing on the May 28, 2006 misconduct during which Plaintiff pled not guilty to all charges.  (Pl. Dep. at 54:8-10:, Pl. Ex. C at D3.)  Dohman produced the ring and photographs at the hearing.  (Dohman Dep. at 21:19-24, 26:2-15; Pl. Dep. at 55:2-56:20.)  Canino found Plaintiff guilty of charges related to the ring and photographs, reducing the charges, in part, "due to positive attitude."  (Pl. Dep. at 58:8-15, Pl  Ex. C at D3, pp. 4-5; June 10, 2010 Canino Dep. at 69:9-14, 70:12-18.)  Canino found Plaintiff permitted to possess the pictures, but ordered the ring "revoked."  (Canino Dep. at 69:6-14, 70:12-18, Pl. Ex. B at P2.)  According to Plaintiff, Canino instructed Plaintiff that he would be allowed to send the ring home, (Pl. Dep. at 58:8-59:10; Canino Dep. at 71:10-24), and warned him that ISD officials were "going to retaliate" against him because of the ring situation and advised him to "back up off them for a minute."   (Pl. Dep. 57:25 to 58:5.)  Canino refuted the latter statement in her deposition.  (Canino Dep. 72:7-12.)

On June 2, 2006, Plaintiff filed Grievance No. 154118 against Dombrosky regarding the cell search and accused him of harassment.  (Pl. Dep. at 59:11-62:9; Pl. Ex. C at D4, pp. 1-2.)  While mentioning Quick's involvement in the search, Plaintiff did not grieve any behavior by Quick, noting that he had "conducted himself in a professional manner, as he have [sic] in the past."  (Pl. Dep. at 60;  Pl. Ex. C at D4, pp. 1-2.)   The grievance was assigned to Radle, (Pl. Ex. C at D-4, p. 3), who responded in writing on June 7, 2006 (1) that Dombrosky had searched, but denied reading, Plaintiff's legal materials; and (2) that the ring was contraband but Plaintiff had been "allowed to send that item home."  (Id.)

### 3. <u>Loss of Plaintiff's Wedding Ring</u>

On October 13, 2006, after Plaintiff received the grievance response, Radle informed Plaintiff orally that his confiscated wedding ring was missing. (Pl. Dep. at 68:12-21; Radle Dep. at 18:17-19:14; Pl. Ex. C at D5, p.3.) Radle instructed that Plaintiff could seek reimbursement for the ring with proof of ownership or a receipt, or bring a criminal complaint regarding its disappearance. (<u>Id.</u>) At some point between October 13 and 28, 2006, Plaintiff asked his sister to send him proof of the cost of the ring. (Pl. Dep. at 71.) On October 28, 2006, Plaintiff filed Grievance No. 168480 about the loss of his ring, requesting reimbursement and indicating his intention to bring civil and criminal actions against Dombrosky. (Pl. Dep. at 66:8-67:22; Pl. Ex. C at D5.) According to Dombrosky's deposition, Dombrosky was unaware both that the ring was missing and of this grievance until after Plaintiff commenced this litigation in July 2007. (Dombrosky Dep. at 42:12-43:20.) Plaintiff disputes this fact, but cites in support only his own deposition testimony that he was "sure" Defendant was aware because it is prison procedure to inform staff of grievances against them. (Pl. Dep. at 66:8-67:22, 77-78.)

On November 14, 2006, Radle responded to Plaintiff's grievance in writing, stating that "I have informed you several times to obtain a copy of the receipt for your ring that was confiscated and we will proceed from that point. I cannot proceed until you provide a copy of a receipt for the property." (Radle Dep. at 35; Pl. Ex. C at P20.) Plaintiff filed no appeal to this response. (Pl. Dep. at 73:1-75:20.) Sometime after receiving Radle's response, Plaintiff received from his sister a copy of a May 21, 1992 ring appraisal provided by Irving Zeigler Jewelers of Philadelphia, which valued a white gold ring containing diamonds at $3,000. (Pl. Dep. at 76:3-76:21; Pl. Ex. C at D6; Pl. Ex. B at P4.) Plaintiff immediately made the appraisal available to the ISD. (Pl. Dep. at 77.)

At some point between Radle's issuance of the grievance response and Plaintiff's provision of the appraisal to ISD, Dohman located a ring believed to be Plaintiff's in the Misconduct Hearing Room. (Dohman Dep. at 44-45.) Dohman took the ring off prison grounds without filing paperwork and brought it to Chiccarine's Jewelers in Collegeville, Pennsylvania, for an independent appraisal.[5] (Dohman Dep. 44:15-49:19.)

### 4. Plaintiff's Placement into Administrative Custody and Transfer from SCI Graterford

On December 6, 2006, Dohman had Plaintiff transferred into the Restricted Housing Unit ("RHU") as "under investigation," in conjunction with the ongoing inquiry into Plaintiff's alleged involvement with distributing contraband. (Pl. Dep. at 85:20-87:24; Dohman Dep. at 83-84.) According to Dohman's deposition, ISD often takes this step at the end of an investigation as a tactic to elicit more information. (Dohman Dep. at 84:1-85:24.) At some point between December 6, 2006, and January 20, 2007, Plaintiff requested access to his legal materials in RHU, but asserts he was not provided with the correct materials. (Pl. Dep. at 124:14-17; Ex. B at P21.)

On December 20, 2006, Dohman, Moyer, and Radle interviewed Plaintiff about the ring appraisal, as well as about their investigation into Plaintiff's correspondence and alleged participation in illicit activities. (Pl. Dep. at 92:23-25, 94:9-96:12, 117:1-18:15; Dohman Dep. at 82:22-83:19; Pl. Ex. C at D10.) During the interview, Dohman informed Plaintiff that he had found Plaintiff's ring. (Pl. Ex. C at D-10, p.4.) He also told Plaintiff that the Collegeville jeweler had told Defendant that the ring was sterling silver set with cubic zirconias worth $50 "at

---

[5]Dohman's deposition states that he believed Plaintiff was "trying to get a . . . false amount for an appraisal on his ring" and that Dohman intended to "include that in a charge for misconduct [he] was preparing to write at some point in time." (Dohman Dep. at 46.)

a flea market on a good day." (Dohman Dep. at 50:8-13; Pl. Ex. C at D10, pp. 5-6.) Plaintiff disclosed to Defendants that (1) his family obtained the ring from a dealer; (2) his family did not have a receipt, but could bring the dealer forward to testify; and (3) his family had procured the appraisal for insurance purposes. (Pl. Dep. at 118:11-15; Pl. Ex. C at D10, pp. 18-19.) During the course of the interview, Dohman stated to Plaintiff that he would "talk to the Deputy about mailing [Plaintiff's] ring out, especially based on the fact that [Plaintiff] had a three thousand dollar appraisal . . . . we'll see what he has to say about mailing that out." (Pl. Ex. C at D10, p. 19.) At the interview's conclusion, Dohman reiterated that "we'll arrange for the ring and . . . we'll go from there." (Pl. Ex. C at D10, p. 22.) Defendant Dohman also informed Plaintiff that he would be receiving a misconduct charge related to allegations of "dealing in illicit products" and that he would be shipping Plaintiff to a different correctional facility for the "safety and security" of the prison, regardless of the results of the misconduct hearing. (Pl. Ex. C at D10, p. 21-22.)

On December 21, 2006, Dohman charged Plaintiff with (1) possession and/or use of a dangerous or controlled substance, (2) possession of contraband, (3) unauthorized use of the mail or telephone, (4) lying to an employee, (5) insurance fraud, and (6) conspiracy. (Pl. Dep. at 119:12-121:22; Pl. Ex. C at D11, pp. 1-3.) The fraud charge pertained to the ring appraisal submitted by Plaintiff. (Canino Dep. at 112, 120-121.)

On January 2, 2007, Hearing Officer Canino convened a hearing, at which Plaintiff pled not guilty to all charges. (Pl. Dep. at 121; Pl. Ex. C at D11, p. 4.) On January 5, 2007, Canino found Plaintiff guilty of all charges and sentenced him to 360 days, of a possible maximum sentence of 630 days, in RHU. (Pl. Dep. at 121; Pl. Ex. C at D11, p. 4; Canino Dep. at 86, 104:8-105:19, 106:1-110:4.) While Canino adjudged each charge to be "serious," she

considered the insurance fraud charge "less serious than the drug related charges." (Canino Dep. at 112:2-23.)

After the hearing, Dohman put in a request to DOC's Central Office that Plaintiff be transferred out of SCI Graterford. (Dohman Dep. at 94-95.) On September 25, 2007, Plaintiff was transferred to SCI Huntingdon. (Pl. Dep. at 9; Moyer Dep. at 43, 49.)

During Dohman's July 23, 2009 oral deposition, Dohman informed Plaintiff's counsel that SCI Graterford prison authorities currently have possession of a ring believed to be Plaintiff's. (Dohman Dep. at 7:12-18.) Dohman produced a copy of a written appraisal conducted by Ciccarine's Fine Jewelry, for a "Gentleman's Silver and Cubic Zirconia Ring" with a replacement cost of $75. (Dohman Dep. at 101:4-105:24; Pl. Ex. B at P13.) The document is dated October 12, 2007. (Id.) Dohman admitted in his deposition testimony that he had not obtained a written appraisal prior to the misconduct issued against Plaintiff for insurance fraud, had based his initial judgment regarding the validity of Plaintiff's appraisal on the oral evaluation performed by the jeweler, and only requested the written estimate after this suit was filed. (Id.)

In January 2010, members of the prison staff sent the ring to SCI Huntingdon for Plaintiff's examination. (Pl's Suppl. Counter Statement of Facts ¶ 109.) Plaintiff stated upon examination that the ring shown to him was not his. (Id.)[6]

**C. Plaintiff's Claims**

Plaintiff claims in Count Two that Quick, Dombrosky, Dohman, and Radle denied Plaintiff meaningful post-deprivation remedies following the loss of his ring, thus, denying him

---

[6] "[B]ased on communications not part of this record," Defendants admit that Plaintiff stated the ring was not his. (Defs.' Reply to Pl.'s Suppl. Counterst. of Facts ¶ 109.) Defendants do not admit to the fact asserted by Plaintiff that he claimed the ring shown to him to be "duplicate." (Id.; Pl.'s Suppl. Counterst. of Facts ¶ 109.)

due process. Plaintiff claims in Count One that these Defendants, as well as Moyer, engaged in a pattern of retaliation against him, charging him with misconduct, placing him in RHU and ultimately relocating him to another DOC facility in direct result of the MRSA class action development and Plaintiff's grievances filed against prison officials.

## II. Parties' Contentions on Summary Judgment

### A. Defendants' Contentions

Defendants first argue that the loss of Plaintiff's ring did not violate Plaintiff's due process rights because the prison's grievance system was available to Plaintiff at all times, providing him with an adequate post-deprivation remedy. (Def's Brief in Supp. of Second Summ. J. Mot. at 4.) Defendants argue Plaintiff's assertion that Defendants made the grievance system unavailable to him has no support in the record, given that (1) Plaintiff was "well versed in the [DOC] grievance procedure and a frequent user of it[;]" (2) Plaintiff knew to file an initial grievance for the loss of the ring; and (3) once Plaintiff complied with Radle's instruction to provide proof of the ring's value, Plaintiff took no further action. (Id.) Defendants contend that, to find a due process violation under Third Circuit precedent, this Court must find that Defendants actively misled Plaintiff or denied him access to grievance forms. (Id. at 5.)

Second, Defendants contend that as a matter of law, they have not retaliated against Plaintiff for exercising his First Amendment rights. (Id. at 6.) As to the first prong of the claim, Defendants concede that Plaintiff's filing of grievances against Dombrosky and for the loss of the ring was constitutionally protected conduct, but insist that Plaintiff's "development" of the MRSA class action was not. (Id. at 7, 10.) Defendants further concede that the misconduct charges issued against Plaintiff satisfy the "adverse action" prong of his retaliation claim. (Id.) However, Defendants contend that Plaintiff has asserted no facts to establish causation. Defendants point to

time lags between grievances filed by Plaintiff and misconduct charges and other actions Plaintiff argues are part of a "pattern of retaliatory behavior," and note that Defendants, like Dombrosky, were not sufficiently aware of certain grievances prior to taking adverse action. (<u>Id.</u> at 10-12.) Defendants argue further that they had legitimate penological interests for searching Plaintiff's cell and taking all disciplinary actions. (<u>Id.</u> at 11.)

Third, Defendants contend that Quick, Dombrosky, Moyer, and Radle had insufficient personal involvement in the claims asserted by Plaintiff. (<u>Id.</u> at 12.) Dombrosky and Quick argue that, while they initially confiscated Plaintiff's ring on May 28, 2006, they had no involvement in Plaintiff's efforts to utilize the grievance system, which provide the basis for Plaintiff's due process claim. (<u>Id.</u> at 12.) Quick argues further that his only contact with Plaintiff was during the May 28, 2006 cell search, during which Plaintiff has stated Quick acted appropriately and, thus, Plaintiff has no basis upon which to assert a retaliation claim against him. (<u>Id.</u>) Dombrosky argues that his contact with Plaintiff ended after the May 28, 2006 search and, thus, he cannot be liable for any actions Plaintiff alleges to be retaliatory that occurred after that date. (<u>Id.</u>)

Moyer, against whom only Plaintiff's retaliation claim remains, contends that his interactions with Plaintiff were limited to monitoring Plaintiff's non-privileged mail as part of the ISD's investigation into Plaintiff's alleged distribution of drugs and contraband. (<u>Id.</u>) Moyer contends that he had no involvement with either Plaintiff's grievances about the ring or the December 21, 2006 misconduct charge. (<u>Id.</u>)

Radle notes that he provided Plaintiff with explanations, first orally and then in response to Plaintiff's October 28, 2006 grievance, on how to obtain reimbursement for the ring. (<u>Id.</u> at 13-14.) However, Radle contends "[h]e did not investigate the value of the ring and did not issue the December 21, 2006 misconduct report." (<u>Id.</u> at 14.)

Finally, Defendants argue that they are entitled to the protection of qualified immunity because Plaintiff has suffered no violation of his constitutional rights.  (Id.)  Were a violation to be found, however, Defendants contend that any violation that occurred was not of a clearly established right.  (Id. at 15.)

**B. Plaintiff's Contentions**

Plaintiff responds by first arguing that Defendants denied him due process by actively misleading him regarding the status of his ring and his responsibilities in gaining redress and, thus, denying him access to the grievance process.  (Pl.'s Resp. at 5-8.)  Plaintiff contends that Defendants wrongly fault him for failing to appeal his initial grievance despite Defendants' indication that appeal or additional grievance were unnecessary.  (Id. at 5-6.)  Plaintiff argues that even his efforts to comply with the valuation requirement resulted in charges of fraud, without any resolution regarding his loss of the ring.  (Id. at 8.)

Second, Plaintiff contends that the evidence supports each element of his retaliation claim.  (Id. at 8-18.)  As to the causation prong, Plaintiff argues generally that "[d]isputes on material issues of fact remain as to the motivations behind the adverse actions" precluding a grant of summary judgment and that a "temporal causal link" demonstrates causation between the various protected activities and adverse actions.  (Id. at 13.)  Further, Plaintiff asserts that Canino's dismissal of a portion of the May 28, 2006 misconduct raises an issue of fact regarding Dombrosky's motivation for bringing that charge, in light of the fact that Plaintiff witnessed Dombrosky reading Plaintiff's legal materials.  (Id. at 14-15.)  Plaintiff contends that warnings he received regarding his protected activities and Defendants' sole reliance on the appraisal for the fraud charge raise questions about the motivations behind his placement in RHU.  (Id. at 15-16.)  Finally, Plaintiff contends that the evidence does not show that officials would have taken the

same actions against him had he not first engaged in protected conduct.  (Id. at 16-17.)

Third, Plaintiff contends that Dombrosky, Quick, Moyer, and Radle all had sufficient personal involvement Plaintiff's claims.  (Id. at 19-20.)  Plaintiff argues that Dombrosky "triggered many of the events giving rise to" Plaintiff's claims, including conducting the pat down search, reading Plaintiff's legal materials, and confiscating the ring.  (Id. at 20.)  Plaintiff argues that Quick was similarly involved in confiscating the ring.  (Id.)  Plaintiff contends that Moyer, along with Radle and Dohman, conducted a December 20, 2006 interview with Plaintiff during which Plaintiff was assured that the ring issue was being resolved, but out of which the fraud charge resulted.  (Id.)  Finally, Plaintiff argues that Radle made a series of other misleading statements regarding the resolution of the ring issue.  (Id. at 21.)

Finally, Plaintiff contends that qualified immunity does not apply to Defendants and that a genuine issue of material fact exists as to whether Defendants misled Plaintiff regarding his access to the grievance procedure, "a clearly established due process violation."  (Id. at 18-19.)

## III. Legal Standards

### A. Jurisdiction

This Court has federal question jurisdiction under 28 U.S.C. § 1331, as this action is brought pursuant to 42 U.S.C. § 1983 and Plaintiff alleges violations of his federal constitutional rights.

### B. Standard of Review

Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.

Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

A party seeking summary judgment always bears the initial responsibility for informing the district court of the basis for its motion and identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case."  Id. at 325.  After the moving party has met its initial burden, the adverse party's response must, "by affidavits or as otherwise provided in this rule set out specific facts showing a genuine issue for trial."  Fed. R. Civ. P. 56(e).  Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Celotex, 477 U.S. at 322.  Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the opposing party.  Anderson, 477 U.S. at 255.

Defendants assert the defense of qualified immunity.  Resolution of that defense requires the Court to determine whether a "constitutional right would have been violated on the facts alleged."  Saucier v. Katz, 533 U.S. 194, 200  (2001).  This Court finds it appropriate to determine whether a violation of Plaintiff's constitutional rights exists and then discuss whether qualified immunity is appropriate.  See Allah v. Al-Hafeez, 208 F. Supp. 2d 520, 527 (E.D. Pa. 2002) (Katz, J.).  As the Supreme Court held in Pearson v. Callahan, 129 S. Ct. 808, 817-8 (2009), trial judges are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the

particular case at hand." <u>Kelly v. Borough of Carlisle</u>, 622 F.3d 248, 253  (3d Cir. 2010).

## IV. Discussion

### A. Due Process Claim

"[A]n unauthorized intentional deprivation of property" by prison officials does not violate the Due Process Clause "if a meaningful post-deprivation remedy for the loss is available." <u>Monroe v. Beard</u>, 536 F.3d 198, 210  (3d Cir. 2008) (quoting <u>Hudson v. Palmer</u>, 468 U.S. 517, 533 (1984)).  For the purpose of ruling on this issue, the record shows a disputed issue of fact as to the ring and requires the Court to assume Plaintiff's ring remains missing.

The Pennsylvania Department of Corrections ("DOC") prison grievance system provides adequate post-deprivation remedies to fulfill due process.  <u>McEachin v. Beard</u>, 319 F. Supp. 2d 510, 514-15 (E.D. Pa. 2004) (Robreno, J.) (citing <u>Tillman v. Lebanon County Corr. Facility</u>, 221 F.3d 410, 422 (3d Cir. 2000); <u>Allah</u> 208 F. Supp. 2d at 536-37.[7]  Thus, due process is satisfied if the grievance procedure is "available to [a prisoner], as a matter of law," and allows that prisoner's "complaint[s] to be heard and responded to and if he were dissatisfied with the response," to appeal.  <u>Griffin-El v. Beard</u>, No. 06-2719, 2010 WL 1837813, at * 7 (E.D. Pa. April 30, 2010) (Restrepo, Mag. J.) (citing <u>Clentscale v. Beard</u>, No. 07-307J, 2008 WL 3539664, at *5 (W.D. Pa. Aug. 13, 2008)).  A prisoner's "failure to [properly] avail himself of such remedy does

---

[7]Pursuant to the Prison Litigation Reform Act of 1995 ("PLRA"), 42 U.S.C. § 1997e(e), "[n]o action shall be brought with respect to prison conditions under Section 1983 of this title or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted."  This provision "make[s] exhaustion of all administrative remedies mandatory – whether or not they provide the inmate-plaintiff with the relief he says he desires in his federal action."  Nyhuis v. Reno, 204 F.3d 65, 67 (3d Cir. 2000).  "To properly exhaust administrative remedies, an inmate must appeal a grievance through all administrative levels of appeal at the inmate's institution."  Johnson v. George W. Hill Correctional Facility, No. 06-4476, 2008 WL 4115768, at *1 (E.D. Pa. Aug. 29, 2008) (Baylson, J.).

not affect its adequacy as a post-deprivation remedy," id. (citing Woods v. Abrams, No. 06-757, 2007 WL 2852525, at *19 (W.D. Pa. Sept. 27, 2007) (Fischer, J.); nor can a court infer a remedy to have been unavailable because of an inmate's internal confusion over the proper procedure. See Tillman, 221 F.3d at 422.

In "rare circumstances," Ramos v. Smith, No. 04-0249, 2005 WL 3054291, at * 5 (E.D. Pa. Nov. 14, 2005) (Surrick, J.), interference by prison officials "with an inmate's attempts at exhaustion impact the availability of the administrative remedy process." Rye v. Erie County Prison, 689 F. Supp. 2d 770, 773 (W.D. Pa. 2009) (McLaughlin, J.) (citing Mitchell v. Horn, 318 F.3d 523, 529 (3d Cir. 2003)).   The Third Circuit has held conduct by prison officials that "thwart[s]" a prisoner's efforts to file grievances may render those procedures "not available" to a prisoner. Brown v. Croak, 312 F.3d 109, 113 (3d Cir. 2002) (finding grievance process unavailable where security officials allegedly directed a prisoner "to wait for the termination of the investigation before commencing a formal claim," contrary to prison regulations, and "never informed [him] that the investigation was completed"); see also Mitchell, 318 F.3d at 529 (finding that prisoner lacked "'available' administrative remedies" after officials denied access to necessary grievance forms); In re Bayside Prison Litigation, 351 Fed. App'x 679, 683  (3d Cir. 2009) (finding plaintiff "introduced evidence sufficient for a reasonable jury to conclude that [defendants] interfered with his access to the grievance system . . . by employing threats that would have deterred an 'individual of ordinary firmness' from filing a complaint"); Rye, 689 F. Supp. 2d at 778 (determining plaintiff's declaration that defendant "led him to believe that [defendant's] decision [on grievance] was final and that no other avenue for appeal existed . . . created material issue of fact as to the availability of the administrative remedy process to Plaintiff").

In the present case, Plaintiff claims, in essence, that on-going representations by Radle and Dohman misled Plaintiff as to the status of the ring and the proper procedure for obtaining redress so as to interfere with Plaintiff's pursuit of a post-deprivation remedy. Plaintiff does not assert that Defendants actively prevented him from grieving the confiscation or loss of his ring by threat[8] or withheld forms. Plaintiff does not claim either that Defendants stood in the way of his efforts to appeal his filed grievances.

The facts, as presented by Plaintiff, clearly demonstrate that these two Defendants made statements over a period of over a year indicating that they were resolving the issue of the confiscated ring and that resolution did not depend on Plaintiff's pursuit of the grievance process. For example, in his written response to Plaintiff's June 2, 2006 grievance, Radle stated that Plaintiff had been "allowed to send [the ring] home," despite the fact that this had not occurred. (Pl. Ex. C at D4, p.3.) In his October 13, 2006 conversation with Plaintiff regarding the status of the ring, Radle informed Plaintiff of its loss and represented that to obtain redress, Plaintiff must provide proof of value. (Pl. Ex. C at D5, p. 1-3; Pl. Ex. C at D6.) Radle then reiterated the need for proof of value in his November 14, 2006 response to Plaintiff's October 28, 2006 grievance, stating that he would "proceed from that point." (Pl. Ex. B at P20.) Plaintiff subsequently provided an appraisal of $3000 to the ISD in December 2006. (Pl. Dep. at 75:21-77:25; Pl. Ex. B at D6; Pl. Ex. B at P4.) As Dohman found a ring believed by Defendants to be Plaintiff's around this time, Plaintiff's submission of the appraisal did not resolve the issue, but instead resulted in Dohman taking the ring offsite for a independent valuation and bringing an insurance fraud charge

---

[8]Plaintiff has, in fact, alleged that Hearing Officer Canino warned him at the May 2006 hearing that "security" was angry with him about the ring, but Plaintiff has not alleged this warning to have been a deterrent to pursuing resolution of the ring's loss. (Pl.'s Resp. to Defs.' Second Summ. J. Mot. at 15; Pl.'s Dep. at 57:25 to 58:5.)

against Plaintiff.   (Dohman Dep. at 44:15-50:24; Pl. Ex. C at D10, pp. 4-5, 18-19.)  However, a jury may infer from the facts that the ring itself remained with the ISD.  Finally, at the December 20, 2006 interview that resulted in the fraud charge, Dohman assured Plaintiff that the ring issue was "taken care of" and that Dohman would "talk to the Deputy about mailing [the] ring out." (Pl. Ex. C at D10, pp. 2, 19, 22.)  This apparently never came to pass.

Viewing all inferences in favor of Plaintiff, sufficient evidence exists on the record to create a genuine issue of material fact as to whether actions by Dohman and Radle interfered sufficiently with Plaintiff's attempts to gain redress for the loss of his ring so as to thwart his post-deprivation remedies.   It is conceivable that Plaintiff would have concluded from Defendants' ongoing representations that the issue would be resolved once he complied with Radle's request for proof of value and, again, once the December 20, 2006 interview had concluded.  It is also conceivable that Defendants' statements actively misled Plaintiff by causing him to believe that he was following the proper process and by actively or constructively deterring him from pursuing the grievance process.

Defendants argue that the grievance procedure was at no time unavailable to Plaintiff and that he was "well versed" in the process and a frequent user and chose not to pursue his initial grievances.   Although there have been no cases from the Third Circuit directly analogous to the case at bar, the Court finds Giano v. Goord, 380 F.3d 670, 676 (2d Cir. 2004), instructive.  In deciding whether to excuse a prisoner's failure to exhaust administrative remedies, the Second Circuit asked whether "circumstances . . . might understandably lead usually uncounselled prisoners to fail to grieve in the normally required way."  380 F.3d at 678.   Similarly, in Rye, Judge McLaughlin found summary judgment inappropriate based on the prisoner's allegations that he had refrained from appealing a grievance after a prison official informed the prisoner, in

advance, that he would simply rule against the prisoner on appeal. 689 F. Supp. 2d at 778. There is no question that Plaintiff understood how to "grieve in the normally required way," Giano, 380 F.3d at 676, and Radle's responses to Plaintiff's grievances provided no basis upon which to appeal. (Pl. Ex. C, D4, D5.) Plaintiff could have reasonably inferred from statements by both Radle and Dohman that he had followed the necessary procedures by filing the initial grievances, providing the appraisal, and waiting to be reimbursed or for the ring to be sent home.

Defendants further argue that for a due process violation to exist prison officials need to have either "directly and affirmatively interfered" with Plaintiff's attempts to use the grievance procedure and assert that, in the Third Circuit, a constructive denial of the grievance procedure is not a due process violation. (Def's Reply to Pl.'s Resp. to Def's Second Summ. J. Mot. at 4.) Nothing in the language of Brown, Mitchell, or Camp v. Brennan, 219 F.3d 279, 281 (3d Cir. 2000), limits those decisions to their facts or compel a decision in Defendants' favor. Brown, in particular, asks generally whether the inmate was "entitled to rely on instructions by prison officials that are at odds with the wording [of the grievance procedures] and whether these instructions rendered the formal grievance procedure unavailable to him." Brown, 312 F.3d at 114. There is sufficient evidence in the record to infer that this was the case here. Additionally, to the extent that the Third Circuit has not explicitly held whether a prison official may violate a prisoner's due process right to adequate post-deprivation procedure through constructive denial, this Court finds it preferable that the legal sufficiency of Plaintiff's claim be decided on a full trial record, rather than on a summary judgment record. As a result, this Court finds granting summary judgment on this Count inappropriate as to Dohman and Radle.

However, this Court finds unavailing Plaintiff's contention that Dombrosky and Quick are "central" to the due process claim because of their role in confiscating the ring. Even had

Defendants confiscated Plaintiff's ring without authorization, a fact that Plaintiff has not asserted, this action alone would not have infringed upon Plaintiff's due process rights as a matter of law. Even viewing the facts in a light most favorable to Plaintiff, Plaintiff presents no facts from which a reasonable jury could infer that these two Defendants played any role in impeding Plaintiff's attempts to seek redress for the loss of the ring. Thus, this Court will grant summary judgment to Defendants Dombrosky and Quick as to Count Two, but will deny summary judgment as to Dohman and Radle.

**B. Retaliation**

In order to prove retaliation, a prisoner-plaintiff must establish (1) that "the conduct which led to the alleged retaliation was constitutionally protected," (2) that the prisoner "suffered some adverse action at the hands of the prison officials," and (3) that there is a "causal link between the exercise of constitutional rights and the adverse action taken against" the prisoner. Rauser v. Horn, 241 F.3d 330, 333 (3d Cir. 2001) (internal quotation marks omitted). In meeting the third prong, a plaintiff must "show that the protected activity was a substantial motivating factor in the state actor's decision to take the adverse action." Miskovitch v. Hostoffer, No. 06-1410, 2010 WL 2465514, at *6 (W.D. Pa. June 15, 2010) (Ambrose, J.) (citing Mt. Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274 (1977); Anderson v. Davila, 125 F.3d 148, 163 (3d Cir. 1997)). In light of proof that exercise of constitutionally protected conduct was a substantial motivating factor in a decision to discipline a prisoner, prison officials will still prevail if "they would have made the same decision absent the protected conduct for reasons reasonably related to a legitimate penological interest." Rauser, 241 F.3d at 333 (citing Turner v. Safley, 482 U.S. 78, 89 (1987)).

**1.    Constitutionally Protected Activity**

Plaintiff has alleged two sets of protected activity: the development of the MRSA class

action and the March 10, June 2, and October 28, 2006 grievances.[9]   Defendants concede in their

Motion for Summary Judgment that, at the very least, the grievances were constitutionally

protected conduct.  See e.g., Allah, 208 F. Supp. at 535 (holding the filing of grievances to be

protected under the First Amendment for purpose of a retaliation claim); (Def.'s Second Summ. J.

Mot. at 7, 10).

## 2.    Adverse Action

With respect to the second element, Plaintiff alleges that he was: (1) subject to a series of

misconduct charges, (2) placed in the RHU between December 2006 and September 2007, and (3)

transferred from SCI Graterford to SCI Huntingdon, on September 25, 2007, far from his family.

(Pl.'s Resp. to Defs.' Second Summ. J. Mot. at 10-13.)[10]  Defendants concede that any misconduct

charges "resulting in a significant period of disciplinary custody" are considered adverse actions,

which would include those issued against Plaintiff for possessing contraband in his cell and the

seven misconduct charges resulting from the December 20, 2006 interview.  (Def.'s Second

Summ. J. Mot. at 7-9.)

## 3.    Causal Link

Regarding the third prong, Plaintiff raises a genuine issue of material fact as to

Dombrosky's motivation for bringing the May 28, 2006 misconduct charge.  However, Plaintiff

has not met his burden of showing the requisite causal link between his protected activities and

---

[9]In Plaintiff's Response to Defendants' Second Motion for Summary Judgment, he references grievances filed on January 20, 2007, February 2, 2007, and April 10, 2007, but has not presented facts showing any adverse action taken as a result of these three grievances.  (Id. at 10.)

[10]Plaintiff also asserts that he experienced denial of access to legal materials once placed in RHU (Pl.'s Resp. to Defs.' Second Summ. J. Mot. at 11, 13.), but advances no argument regarding a causal link between this action and Plaintiff's constitutionally protected conduct.  (Id. at 13-16.)

any adverse actions taken by the remaining Defendants.  In establishing causal connection, a plaintiff cannot simply rely on "'general attacks' upon the defendants' motivations and must produce 'affirmative evidence' of retaliation from which a jury could find that the plaintiff had carried his burden of proving the requisite motive." Brooks v. DiGuglielmo  No. 05-4588, 2008 WL 5187529, at *12  (E.D. Pa. 2008) (O'Neill, J.) (quoting Ebersole v. Pennsylvania, No. 3:01-1924, 2007 WL 2815730, at *6 (M.D. Pa. Sept. 25, 2007)).  The Third Circuit concluded in Rauser that "suggestive temporal proximity" can be "relevant to establishing a causal link between protected conduct and retaliatory action" in prisoner civil rights cases.  Ambrose v. Twp. of Robinson, 303 F.3d 488, 494 (3d Cir. 2002) (quoting Rauser, 241 F.3d at 334).  However, "evidence of temporal correlation is no substitute for evidence of causation." Carter v. Morrison, No. 06-3000, 2010 WL 701799, at *12 (E.D. Pa. Feb. 24, 2010) (Buckwalter, J.). Compare Rauser, 241 F.3d at 334 (determining a reasonable jury could infer retaliatory motive where prison officials warned plaintiff he would be subject to adverse action if he continued "to disrupt prison programs with Constitutional challenges" on the eve of taking adverse actions against him), with Brooks, 2008 WL 5187529, at *13 (granting defendant's motion to dismiss where plaintiff merely offered "conclusory statements" as to why defendant placed him in RHU on the day plaintiff informed defendant about pending civil rights litigation).

It is undisputed that Dombrosky searched Plaintiff in March 2006, resulting in Plaintiff's March 7, 2006 grievance against Dombrosky for aggravating Plaintiff's MRSA-related wounds. (Pl. Dep. at 27:17-23, 29:1-31:21, Pl. Ex. C at D2, pp. 1-2.)  Plaintiff presents no evidence to support an allegation that Dombrosky was aware of this grievance prior to the May 28, 2006 search of Plaintiff's cell.  However, Defendants have conceded for the purpose of this motion that Dombrosky read, or at least searched through, Plaintiff's legal materials and would have come in

contact with Plaintiff's grievance against him during the cell search. (Defs.' Reply to Pl.'s Suppl. Counterst. of Facts ¶ 96.) Dombrosky immediately brought a misconduct charge against Plaintiff, from which a reasonable jury might infer a suggestive temporal proximity. See Rauser, 241 F.3d at 334; (Radle Dep. at 35:6-36:2; Pl. Dep. at 63; Pl. Ex. B at P19, P20).

Dombrosky advances a legitimate, penological reason for having brought misconduct charges against Plaintiff as prison regulations barred possession of the photographs and the ring. However, a portion of that charge was dropped when officials were unable to produce the contraband oil allegedly discovered in Plaintiff's cell, raising questions about the legitimacy of that charge. See Kounelis v. Sherrer, 529 F. Supp. 2d 503, 531-32 (D.N.J. 2008) (Debevoise, J.) (granting plaintiff leave to amend complaint where defendants subjected plaintiff to false charges, later dismissed, less than a month after plaintiff filed litigation against another prison official). Furthermore, Plaintiff asserted in his deposition that Canino warned Plaintiff at the subsequent misconduct hearing that Plaintiff had invoked the ire of security officers. See e.g., Rauser, 241 F.3d at 334 (finding probative of defendants' motivating factors plaintiff's sworn statement that he was warned against engaging in protected conduct); (Pl. Dep. 57:25 to 58:5). While Canino's alleged remark did not implicate any one Defendant, the evidence does not indicate any other officer besides Dombrosky with whom Plaintiff had experienced prior conflict. A jury could reasonably infer from the proximity between Dombrosky's contact with Plaintiff's legal materials and filing of the misconduct charge, the questionable nature of the contraband oil charge, and Canino's warning that Dombrosky's motivations for bringing the March 7, 2006 grievance against Plaintiff were retaliatory.

As for the claims of retaliation against the remaining Defendants, it is also undisputed that Dohman ordered Plaintiff placed in RHU on December 6, 2006, as "under investigation,"

following a two-year inquiry into Plaintiff's conduct, which ultimately culminated in misconduct charges related to distribution of contraband. (Pl. Dep. at 85-86; Dohman Dep. at 83-84.) Plaintiff contends that Defendants took this action in retaliation for his October 28, 2006 grievance, but makes not assertions as to the motivations of any specific Defendant. (Pl.'s Resp. To Defs.' Second Summ. J. Mot. at 14.) The five week time period between protected conduct and adverse action, without more, cannot raise an inference that one was the substantial motivating factor for the other. Furthermore Defendants are able to point to their on-going investigation of Plaintiff as the impetus for placing him in RHU. (Id.) Because the record shows a legitimate penological reason for Plaintiff's placement in RHU, he cannot maintain a retaliation claim on that basis.

Plaintiff also tries to draw a temporal link between his December 17, 2006 request for access to legal materials and the December 21, 2006 misconduct charges. Again, Plaintiff's claims simply come across as "general attacks" on Defendants' motivations without reference to the actions or motivations of any one individual Defendant. See Brooks, 2008 WL 5187529, at *12.

This rationale applies, as well, to Plaintiff's claim that Defendants acted with retaliatory motive in bringing the December 21, 2006 misconduct charge, which resulted in his continued placement in RHU, and subsequently transferring him to SCI Huntingdon. Plaintiff challenges the validity of these adverse actions based on questions surrounding the charge brought against Plaintiff for insurance fraud as a result of Dohman's suspicions regarding the authenticity of Plaintiff's ring appraisal. (Pl.'s Resp. To Defs.' Second Summ. J. Mot. at 14.) The decision by Dohman to take Plaintiff's ring from the prison facility for an independent appraisal and to include in the December 21 misconduct charges of insurance fraud without pursuing any criminal

charges against Plaintiff could be relied upon by the jury to infer that Dohman had questionable motivations for pursuing the fraud charge. However, Plaintiff provides no "affirmative evidence" as to why Dohman, in particular, had motive to retaliate against Plaintiff. See Brooks, 2008 WL 5187529 at *13; (Pl.'s Resp. To Defs.' Sec. Summ. J. Mot. at 14, 17). Further, aside from the one fraud charge, Dohman set the wheels in motion for taking the December 2006 disciplinary actions and, ultimately, initiating Plaintiff's transfer out of SCI Graterford back in 2004, due to suspicions related to Plaintiff's participation in illicit activities and concerns about prison security. Given Defendants' demonstration of legitimate penological interests, Plaintiff fails to meet the elements of a retaliation claim for his placement in RHU, both initially and as a result of the December 21, 2007 misconduct charges, and for his transfer to SCI Huntingdon. Therefore, this Court will grant summary judgment on the retaliation claims as to all Defendants except Dombrosky.

### C. Qualified Immunity

The doctrine of qualified immunity provides that government officials performing "discretionary functions" are shielded from suit if their conduct did not violate "clearly established statutory or constitutional rights of which a reasonable person would have known." Wilson v. Layne, 526 U.S. 603, 609 (1999); see also Couden v. Duffy, 446 F.3d 483, 492 (3d Cir. 2006).

The Supreme Court has articulated the qualified immunity analysis as comprised of two inquiries. Pearson, 129 S. Ct. at 816-18 (modifying Saucier to the extent that courts need not address one specific inquiry before the other). First, the constitutional question is "whether the facts that a plaintiff has alleged or shown make out a violation of a constitutional right." Pearson, 129 S. Ct. at 816 (quoting Saucier, 533 U.S. at 201) (citation omitted), in other words, "whether there is even a wrong to be addressed in an analysis of immunity." Curley v. Klem, 499 F.3d 199,

206 (3d Cir. 2007) ("Curley II").  Second, the qualified immunity question is "whether the right at issue was 'clearly established' at the time of a defendant's alleged misconduct."  Pearson, 129 S. Ct. at 816 (quoting Saucier, 533 U.S. at 201).  "If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate."  Saucier, 533 U.S. at 202.  Id.  If the Court finds an defendant to have "made a reasonable mistake about the legal constraints on his actions," that defendant is still protected from suit.  Curley II, 499 F.3d at 207.

As the doctrine of qualified immunity provides not only a defense to liability, but "immunity from suit,"  a court should ordinarily determine this question "long before trial." Hunter v. Bryant, 502 U.S. 224, 228  (1991).  As the Third Circuit expressed in Curley II, "[t]hat is well and good when there are no factual issues in a case, but often the facts are intensely disputed, and our precedent makes clear that such disputes must be resolved by a jury after a trial."  499 F.3d at 207.  While the question of whether an officer made a reasonable mistake of law is a "question of law properly answered by the court," a jury must "determine[ ] the disputed historical facts material to the qualified immunity question."  Bowman v. Reilly,  No. 09-1322, 2010 WL 831412, at *8-9  (E.D. Pa. March 4, 2010) (Slomsky, J.) (finding issues of fact for the jury, including the placement of plaintiff's hands, integral to determining whether "defendant may be found to have been on notice that his conduct violated Plaintiff's rights") (quoting Curley II, 499 F.3d at 210-11) (holding that a jury must resolve disputed historical facts regarding information available to defendant state trooper prior to court's determination of the reasonableness of trooper's force against plaintiff).  A "decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis." Id. (citing Curley v. Klem, 298 F.3d 271, 278 (3d Cir. 2002) (Curley I); Giles v. Kearney, 571

F.3d 318, 326 (3d Cir. 2009)).

### 1.    Qualified Immunity: Due Process Claim

Viewing the facts in the light most favorable to Plaintiff, a reasonable jury could infer that conduct by Radle and Dohman violated Plaintiff's constitutional right to a post-deprivation remedy for the loss of his ring.   There is no question that it is a violation of the Due Process Clause for prison officials to deny a prisoner his constitutionally-mandated grievance procedure. The Third Circuit has further confirmed that actions by prison officials to mislead a prisoner about proper procedure for or thwart his access to grievance procedures can render those procedures unavailable.  Development of a full factual record and resolution of these issues by the jury could result in a decision that Defendants constructively denied and possibly actively misled Plaintiff's access to the grievance procedure.  Because "disputed historical facts material to the qualified immunity question" remain, Curley II, 499 F.3d at 211, the Court finds it premature to grant summary judgment to Radle and Dohman as to Count Two.

### 2.    Qualified Immunity: Retaliation Claim

This Court finds as well that the evidence of record does not warrant a grant of qualified immunity in favor of Dombrosky as to the retaliation claim.  Drawing all inferences in Plaintiff's favor, he has established a genuine issue of material fact regarding Dombrosky's motivations for bringing the May 28, 2006 misconduct on the day that Dombrosky allegedly discovered Plaintiff's March 7, 2006 grievance against him.  There is no doubt that adverse actions taken by Dombrosky in retaliation for Plaintiff's filing of grievances against him would constitute a constitutional violation as the law on this point is clearly established.  The Court finds summary judgment for Dombrosky on this claim to be inappropriate at this stage.

As the Court sees fit to grant summary judgment to all other Defendants on all other

Counts, it need not address the issue of qualified immunity.

**V. Conclusion**

For the aforementioned reasons, the Court denies the motion for summary judgment brought by Radle and Dohman as to Count Two and the motion for summary judgment brought by Dombrosky as to Count One.  All other motions for summary judgment will be granted.